JACOB W. EILTS, APPELLANT, V. RUSSELL F. BENDT ET AL.,
APPELLEES.

76 N. W. 2d 623

Filed April 27, 1956. No. 33900.

*Carstens & Pickett, Davis, Healey, Davies & Wilson,*
*Kenneth Cobb,* and *Robert Berkshire,* for appellant.

*Chambers, Holland & Groth,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

The plaintiff, Jacob W. Eilts, brought this action at law in the district court for Lancaster County against Darrell Glissendorf and Russell F. Bendt as defendants to recover damages for personal injuries sustained by him due to a collision between an automobile in which he was riding as a guest driven by Russell F. Bendt, and another automobile operated by Nora Dowling. The collision occurred on U. S. Highway No. 81 in Madison County. The cause was tried to a jury, resulting in a verdict in favor of the defendants. The plaintiff filed a motion for new trial. From the order overruling the motion for new trial, the plaintiff appeals.

The plaintiff's petition alleged in substance that on or about September 25, 1951, the plaintiff was riding as a passenger in a 1949 2-door Ford which was in the possession of Darrell Glissendorf who exercised control over the operation of said vehicle which was driven by Russell F. Bendt in a southerly direction on U. S. Highway No. 81 at a point approximately 1½ miles south of Norfolk, Nebraska, when, as a proximate result of the grossly and willfully negligent acts of omission and commission of the defendants and each of them, the 1949 2-door Ford collided head-on with a 1934 Ford operated by Nora Dowling. The petition alleged grossly negligent acts on the part of the defendants which need not be set out.

The defendants' answer admitted the occurrence of the accident and that plaintiff sustained injuries. The answer then alleged that the plaintiff, at the time of the accident, was a guest passenger in said automobile; that at the time of the accident the defendant Russell F. Bendt was driving said automobile in a careful and prudent manner and at a time when the headlights were operating on the automobile he was driving and on other

automobiles using said highway at that time and place; and further alleged that suddenly and without any negligence on his part he met with an emergency in that an oncoming car approached the point on the highway where this accident occurred without operating headlights so that the defendant was unable to see said automobile until it was so close to him that an accident was unavoidable and a collision occurred. Further answering, the defendants specifically denied each allegation of negligence on their part alleged by the plaintiff, and denied each and every other allegation contained in the plaintiff's petition not specifically admitted.

The reply was in effect a general denial of the allegations of the defendants' answer, with the exception of certain admissions contained therein.

The plaintiff assigns as error that the trial court erred in failing to instruct the jury that if it found the defendants or either of them were guilty of gross negligence, then the negligence, if any, of the driver of the 1934 Ford would not constitute a defense in favor of the defendants unless it found that the negligence of the driver of the 1934 Ford was the sole and proximate cause of the plaintiff's injuries and damage; or, in other words, that the defendants would be liable notwithstanding the negligence, if any, of the driver of the 1934 Ford if it found the defendants, or either of them, guilty of gross negligence.

The record discloses that Darrell Glissendorf, Russell F. Bendt, and Jacob W. Eilts were soldiers in the United States Army stationed at Fort Riley, Kansas. They were in the same company and had a casual acquaintance with each other. Glissendorf lived near White Lake, South Dakota; Bendt lived at Sherman, South Dakota; and Eilts lived at Ree Heights, South Dakota. At or about noon on September 22, 1951, those in authority announced that week-end passes would be issued. As soon as Glissendorf found out that passes were to be issued, he decided to go home. He went into the bar-

racks and announced that he was going to South Dakota, and if there was anybody that would like to go along, they could. Bendt and Eilts said they would like to go. The three of them talked the matter over and finally decided they would go together. Glissendorf had possession of a 1949 2-door Ford, the title of which was in the name of Glissendorf and Sons. The car was in Junction City. They went to Junction City, and something was said about sharing expenses. Glissendorf said that it would not be necessary as he was going home anyway and it would not cost him anything to take them along. On the way to South Dakota, Bendt and Eilts were delivered at certain places to enable them to get to their respective homes. On the return trip to Fort Riley, Glissendorf picked up Eilts and Bendt at the places agreed upon, and the three of them proceeded toward Fort Riley. They took U. S. Highway No. 81, south. This was on Sunday, September 23, 1951. Eilts testified that he thought it was approximately 580 miles from South Dakota to Fort Riley. He also thought that on one occasion while he was on the trip he purchased gas. Glissendorf and Bendt testified to the contrary. Eilts got into the back seat of the car and went to sleep, and was asleep at the time of the accident. He had no knowledge of what occurred. He saw Glissendorf and Bendt drive, and thought they both drove carefully.

Bendt testified that when they arrived at Wausa, Nebraska, they all went into the rest room. When they came out, Glissendorf paid for the gas. There was a car behind their car that wanted to get to the gas pump, so he got into the driver's seat to move the car out of the way. Glissendorf got in next to him and told him he could drive for awhile. Wausa is about 40 miles north of Norfolk. About 20 miles out of Wausa, Glissendorf turned on the car lights because it was getting dark, the clouds were low, and it was misting a little. After that Glissendorf went to sleep and knew nothing about the occurrence of the accident.

Bendt testified that the headlights on the car continued to burn at all times; that just south of Norfolk there is an airport; that U. S. Highway No. 81 is black-top and at the place of the accident the highway was level; that he drove up behind a south-bound car going in the same direction as the car he was driving; that it was going slower than he was, and he overtook it; that when he got right up behind this car he pulled out a little ways to see if anything was coming from the opposite direction; and that he did not see any car approaching from the south, so he blinked his lights and proceeded to pass the car ahead of him. When he was about even with it, a 1934 Ford coach appeared at a distance of 100 or 150 feet ahead of him. It was coming from the south, going north. He was unable to get back onto his own side of the highway. There were no headlights burning on the car coming from the south toward him. The first thing he saw was the headlights of the car he was driving reflecting on the oncoming car and showing somewhat of a beam on the pavement. When he pulled out to go around the car in front of him, he was going 45 or 50 miles an hour. He was not asleep at the time of the accident, and there is no evidence that he was. He believed the oncoming car was traveling at a speed of 20 to 25 miles an hour, and the car ahead of him was traveling at a speed of 40 to 45 miles an hour.

A Mr. Evans testified that on the day of the accident he was driving a 1949 Fraser automobile from his home in Neligh to Lincoln with some young ladies that he knew who were employed at St. Elizabeth Hospital in Lincoln; and that when he left Neligh, which is about 35 miles from Norfolk, it was raining intermittently, and misting. It was a murky, dark, dreary day. He had his headlights on. When he arrived at Norfolk it had more or less quit raining. When he was in the vicinity of the airport on U. S. Highway No. 81, he was aware that a car was following him. His attention was

called to this fact when he was a mile or so north on the highway, by watching through his rear-view mirror. The car behind him blinked its lights to pass. The headlights on his car were on. As the car started to pass him, he was looking south, paying attention to his driving. He observed no car approaching from the south. When the car attempting to pass was alongside and about even with Evans' car, Evans was watching to the south and saw a car coming from that direction at a distance of from 100 to 150 feet from him. The headlights on this car were not burning. Just seconds elapsed from the time he saw the oncoming car until the accident occurred. The car endeavoring to pass him tried to turn back into its own right-hand lane. At that time it was not raining, it was murky and dark, and visibility was not good. He further testified that he had passed other cars and cars had passed him in that vicinity, all of which had their headlights on. He believed that both he and the driver of the car endeavoring to pass him saw the oncoming car at the same time. He knew it was going to be awfully close. He applied his brakes as the car attempting to pass him tried to turn in, and the crash occurred at that moment. When the crash occurred, both cars involved in the collision came to a stop. The 1949 Ford cut across in front of him and went into the west ditch. He went between the two cars.

On cross-examination he testified he first saw the car behind him a quarter of a mile back; and that he was driving 45, 50, or 55 miles an hour when the car behind him started to pass him. At that time the car attempting to pass him was going at a speed of from 50 to 60 miles an hour.

A student nurse riding with Evans testified that she sat on the left-hand side in the back seat. Shortly before the accident she was watching a plane that was landing at the airport on the right side of the highway, and she saw nothing of the north-bound car

before the accident. The first thing she noticed was the lights on the south-bound car attempting to pass them as the lights blinked. It was dark enough for her to see the beam of the lights. Evans called attention to the north-bound car. She looked up momentarily. The headlights on the north-bound car were not on. She thought they were traveling at 50 to 60 miles an hour. She did not see the actual collision. She rendered first aid to the persons in the north-bound car who were injured.

There were six people in the Evans car, and a witness who sat in the front seat next to Evans, the driver, testified that the parking lights and the headlights on the car were on when they left Neligh. She knew there was a car behind them, and remembered it coming up beside their car to pass on the left side. When that car was even with their car, she noticed a car coming from the south with no headlights lit. The driver endeavoring to pass them tried to turn to the right in front of them. The two cars collided. The pavement was dark as it had been raining. The car coming from the south was black. In a statement made shortly after the accident, she said the car coming from the south was probably a block or two away when she first saw it.

An employee of the United States Weather Bureau at Norfolk testified by deposition that he was in charge of the weather bureau office. He explained the method of observing the weather and the making of reports relating to weather conditions. He testified that the office is located at the Norfolk airport; that the observations were recorded at 6:30 p. m., on September 23, 1951; and that the sky was overcast, the ceiling 3,000 feet, visibility more than 15 miles, and the surface wind north-northwest at 9 miles per hour. He further testified that "overcast" means that the sky "was completely covered by clouds, the lower portion of which was at 3,000 feet. And the remarks, 'few scud,' indicated there were a few lower clouds under the 3,000-

foot layer." "Visibility" relates to the clearness of the atmosphere at the particular time. Visibility of 15 miles would show the air was clear of any obstructions such as fog, dust, smoke, or anything of that nature. On September 23, 1951, the sunset occurred at 6:26 p. m. The last precipitation recorded on that date was at 5:10 p. m. He was not at the airport on the day of the accident, and these observations were not made by him. Such observations are taken from the surface of the ground. From his own knowledge, he could not make any statement as to how far a man could see an unlighted object on the ground level of U. S. Highway No. 81 in front of the airport. These observations were made with reference to fixed objects such as the horizon, mountains, trees, etc.

A pilot-instructor, who landed at the airport about 6:20 that evening, testified that the ceiling was about 800 feet, and that the airport is 200 to 300 feet west of U. S. Highway No. 81. After he had stopped, he heard a crash and could discern the Fraser car and the 1949 green Ford which was about the center of the highway, cutting across in front of the Fraser car. He estimated it was traveling 30 miles an hour.

A sergeant of the Nebraska Safety Patrol was working with a lieutenant of the patrol the evening the accident occurred, and arrived at the scene of the accident about 5 minutes after it occurred. They received the call at 6:27 p. m. When they arrived at the scene of the accident they found that two cars had been involved in the accident, a 1933 Ford coach and a 1949 Ford coach. The 1949 Ford coach, in relation to the highway, was in the west grader ditch headed in a southwesterly direction. The 1933 Ford was in a grader ditch on the opposite side of the road, headed in a northwesterly direction. The left front of the 1949 Ford was damaged the most, and the damage to the 1933 Ford was practically the same. There was a gouge in the pavement caused by a part of the 1949 Ford. The front end

was badly damaged, the front wheels were out from under it, at least the left one and part of the axle, which perhaps accounted for the gouge in the pavement. It was possible to follow from the gouge up to where the car left the pavement and on across the shoulder of the highway to its position in the ditch. The 1933 Ford was in the east grader ditch headed in a northwesterly direction. The ditch was rather deep, and the back of the car was tight against the back of the ditch. When the 1933 Ford came to a stop, it was east of the gouge mark, and south of the north point of the gouge mark, about 35 feet to the front of the car. He had a conversation with Bendt at the Norfolk Lutheran Hospital, and Bendt told him he was driving 60 miles an hour. He further testified that the speed limit was posted north of where the accident happened, and also south of that point. It was a 45-mile-an-hour speed zone. The occupants of the 1949 Ford were injured, and also those in the 1933 Ford.

The lieutenant of the Nebraska Safety Patrol testified that he was driving a patrol car at the time of the accident, was using artificial lights as a precaution, had the parking lights on, and had used them a couple of hours that afternoon. The morning after the accident he went with his partner and the county attorney again to the scene of the accident. Where the cars hit, there were no skid marks. The 1933 Ford was driven backward by the impact and went off the east side of the highway at an angle and into the ditch. It had been driven backwards 25 or 30 feet. The ditch on the east was about 4 feet deep, and narrow, and the car went off the bank, with the front end of the car up on the shoulder of the highway. The left front parts of both cars were badly damaged. They did not hit squarely. It was sort of a "scissor." It looked like one was attempting to avoid the other. On cross-examination he testified that the clouds were hanging low, and the ground was damp.

The defendants moved for dismissal of plaintiff's case at the close of the plaintiff's evidence and also at the close of all of the evidence.

The plaintiff cites McClelland v. Interstate Transit Lines, 142 Neb. 439, 6 N. W. 2d 384; Stark v. Turner, 154 Neb. 268, 47 N. W. 2d 569; Kuska v. Nichols Construction Co., 154 Neb. 580, 48 N. W. 2d 682; and Welstead v. Ryan Construction Co., 160 Neb. 87, 69 N. W. 2d 308; and contends the rule set forth in said cases is applicable to the case at bar. The rule is announced in the last-cited case as follows: "When separate and independent acts of negligence by different persons combine to produce a single injury, each participant is liable for the resulting damages, though one of them alone would not have caused the result."

We deem it unnecessary to analyze the foregoing-cited cases in this opinion. They have been considered in connection with the contention made by the plaintiff. Suffice it is to say that the rule heretofore set out in said cases is not applicable to the instant case.

In the instant case the plaintiff sued the defendants alleging that the plaintiff was a guest, and his host driver was guilty of gross negligence. The statute here involved is section 39-740, R. R. S. 1943, which provides in part: "The owner or operator of a motor vehicle shall not be liable for any damages to any passenger or person riding in such motor vehicle as a guest or by invitation and not for hire, unless such damage is caused by the driver of such motor vehicle being under the influence of intoxicating liquor or because of the gross negligence of the owner or operator in the operation of such motor vehicle. For the purpose of this section, the term 'guest' is hereby defined as being a person who accepts a ride in any motor vehicle without giving compensation therefor, * * *."

There is no evidence of the use of intoxicating liquor in this case by either of the defendants during the course of the trip to and from Fort Riley and South Dakota.

A person riding in a motor vehicle is a guest if his carriage confers only a benefit upon himself and no benefit upon the owner or operator except such as is incidental to hospitality, social relations, companionship, or the like, as a mere gratuity. See, Born v. Estate of Matzner, 159 Neb. 169, 65 N. W. 2d 593; Paxton v. Nichols, 157 Neb. 152, 59 N. W. 2d 184.

. Under the factual situation presented in this case, there is no question but that the plaintiff was a guest passenger in the car being driven by the defendant Bendt.

Another rule applicable in the instant case is as follows: "A guest to recover damages from his host for injury received by the guest while riding in a motor vehicle operated by the host must prove by the greater weight of the evidence in the case the gross negligence of. the host relied upon by the guest and that it was the proximate cause of the accident and injury." Born v. Estate of Matzner, *supra.*

"Gross negligence means great and excessive negligence; that is, negligence in a very high degree. It indicates the absence of slight care in the performance of a duty." Born v. Estate of Matzner, *supra.* See, also, Morris v. Erskine, 124 Neb. 754, 248 N. W. 96.

"The existence of gross negligence must be determined from the facts and circumstances in each case." Lemon v. Hoffmark, 132 Neb. 421, 272 N. W. 214. See, also, Morris v. Erskine, *supra.*

Under the foregoing statute, the rule with reference to tort-feasors contended for by the plaintiff has no applicability for the reason that the test of the liability of the host to a guest passenger is whether the host or the driver of the car in which the plaintiff was a guest passenger was guilty of gross negligence and not simply whether his negligence contributed to cause the accident. See, § 39-740, R. R. S. 1943; Born v. Estate of Matzner, *supra;* James v. Krebek, 142 Neb. 757, 7 N. W. 2d 637.

With the foregoing rules in mind, which we deem applicable to the case at bar, the question presented is whether or not the record in the instant case shows sufficient facts to constitute gross negligence on the part of the defendant driver of the 1949 Ford, or on the part of defendant Glissendorf.

Without repeating the evidence in detail, the record discloses that there were no continuous acts of negligence during the return trip on the part of either defendant. There is no evidence of excessive speed at any time prior to the accident. Glissendorf and the plaintiff had sufficient confidence in the driving of Bendt that they went to sleep and placed the full responsibility of the operation of the car in him. He was probably as tired as they were after a rather strenuous weekend, however, there is no evidence that he was asleep at the time of the accident. The evidence discloses the weather conditions at the time as raining at intermittent periods, and murky to the extent that as a matter of precaution most motorists had their lights on. The operator and a passenger of the Fraser car directly ahead of the 1949 Ford going in the same direction were unable to see the approaching car without its headlights on and which was dark in color. In addition, the black-top paving was dark under the prevailing circumstances at the time of the occurrence of the accident. The fact that there may or may not have been signs north and south of the point of the accident indicating that it was a 45-mile-per-hour zone and the failure of the driver of the 1949 Ford to observe such signs, or whether he did or not, would not in and of itself constitute gross negligence on the part of such driver.

As stated in Born v. Estate of Matzner, *supra:* "The violation of traffic regulations concerning stop signs, speed, the manner of operating a motor vehicle on the highway, and the like is not negligence as a matter of law of any kind or degree, but it is a fact to be con-

sidered with the other evidence in the case in deciding an issue of negligence."

At most, in analyzing all the facts pertinent to the accident as hereinbefore set forth, the defendant Bendt may have been guilty of negligence, that is, doing something that a reasonable and prudent person would not ordinarily have done in the situation and under such circumstances, yet he was not guilty of gross negligence as such term has been defined by this court.

In the light of the record, the following is applicable: "A case will not be reversed for errors against a party not entitled to succeed in any event." Holberg v. McDonald, 137 Neb. 405, 289 N. W. 542. The cited case was controlled by section 39-1129, C. S. Supp., 1937, now section 39-740, R. R. S. 1943. The defendant made a motion for a directed verdict at the close of the plaintiff's evidence on the ground that the evidence failed to show gross negligence on the part of the driver of the defendant's car. This motion was overruled, and at the close of all of the evidence the case was submitted to a jury which returned a verdict for the defendant. From the overruling of plaintiff's motion for new trial and dismissal of plaintiff's cause of action, appeal was taken. This court concluded that the verdict of the jury was the only one that could be sustained on the evidence adduced, and affirmed the judgment of the trial court.

In the instant case, at the close of the plaintiff's evidence, the defendants moved for a dismissal of the plaintiff's case on the ground that the evidence was insufficient to show gross negligence on the part of either or both of the defendants, and again at the close of all of the evidence the defendants renewed this motion. The motion was overruled. Under the evidence adduced, the motion should have been sustained by the trial court. The cause was submitted to the jury and the jury found in favor of the defendants, which was the only verdict that the jury could properly return under the evidence adduced.

Concluding, as we do, that there was no error prejudicing the plaintiff in the presentation of his evidence and that the verdict was the only one that could be sustained by the evidence, the judgment of the trial court is affirmed.

AFFIRMED.