NETTIE CARTER, GUARDIAN OF TROY V. CARTER, INCOMPE-
TENT, APPELLANT, v. CHICAGO, BURLINGTON & QUINCY
RAILROAD COMPANY, A CORPORATION, ET AL., APPELLEES.

103 N. W. 2d 152

Filed May 13, 1960.    No. 34581.

John J. Wilson, Healey, Wilson & Barlow, and Kenneth Cobb, for appellant.

Mason, Knudsen, Dickeson & Berkheimer, Richard M. Duxbury, J. W. Weingarten, Jack Devoe, and Elmer M. Scheele, for appellees.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action brought in the district court for Lancaster County by Nettie Carter as guardian of Troy V. Carter, an incompetent person, .plaintiff, against the Chicago, Burlington & Quincy Railroad Company, a corporation, Roy Vermaas and Earl Vermaas, individually and doing business as Vermaas Service Station, Vermaas Service Station, Inc., a corporation, and United States Rubber Company, a corporation, defendants, to recover damages alleged by plaintiff to have been suffered by Troy V. Carter, resulting from a collision be-

tween an automobile, owned and operated by the defendant Roy Vermaas, and a train owned and operated by the defendant railroad company, occurring at the intersection of North Twenty-seventh Street, Lincoln, Nebraska, and the defendant railroad company tracks, on the evening of December 14, 1955.

The case was tried to a jury, resulting in a verdict in favor of the defendants Chicago, Burlington & Quincy Railroad Company, a corporation, Roy Vermaas and Earl Vermaas, individually and doing business as Vermaas Service Station, and Vermaas Service Station, Inc., a corporation.

The United States Rubber Company, a corporation, is in the case on the ground that it was and is obligated, pursuant to the workmen's compensation law of Nebraska, to make certain payments on behalf of Troy V. Carter who, at the time of the accident, was an employee of the defendant United States Rubber Company. This defendant filed an answer because of its claimed subrogation rights under the workmen's compensation law.

The plaintiff, Nettie Carter, guardian of Troy V. Carter, incompetent, filed a motion for new trial against the Chicago, Burlington & Quincy Railroad Company, a corporation, and a motion for new trial against the defendants Vermaas, as above designated. The trial court overruled both motions for new trial involving all defendants, of course except the United States Rubber Company. From the order overruling her motions for new trial, the plaintiff perfected appeal to this court.

All parties to this action agreed that at all times material to the case the defendants Roy Vermaas and Earl Vermaas were doing business as Vermaas Service Station; that Roy Vermaas was the owner and operator of the automobile involved in the accident; that Vermaas Service Station, Inc., was a corporation organized and existing under the laws of the State of Nebraska and a successor to Roy Vermaas and Earl Vermaas doing

business as Vermaas Service Station; that the defendant, Chicago, Burlington & Quincy Railroad Company was a corporation organized and authorized to do business in the State of Nebraska, and said defendant was the owner of the train and engine involved in the accident which was being operated by Mr. Merle White, an employee who at all times was acting in behalf of said company and within the scope of his employment; that Nettie Carter was the duly appointed, qualified, and acting guardian of Troy V. Carter, an incompetent person; and that the accident occurred within the limits of the city of Lincoln, Nebraska.

For convenience Troy V. Carter will be referred to as Carter, or plaintiff's ward; the defendant Chicago, Burlington & Quincy Railroad Company, a corporation, as Burlington; the owner and operator of the automobile here involved as Roy Vermaas; the defendants Roy Vermaas and Earl Vermaas, individually and doing business as Vermaas Service Station, and the Vermaas Service Station, Inc., a corporation, as defendants Vermaas, or as Vermaas; Marvin L. McGee as McGee; and Joe E. Tomsik as Tomsik.

The plaintiff's petition alleged that on the evening of December 14, 1955, while Troy V. Carter was riding at the request of Roy Vermaas in his 1955 Packard sedan and was being driven by Roy Vermaas to the "Steak House" owned by Earl Vermaas so that he could join them for certain contemplated business negotiations, and while proceeding north on North Twenty-seventh Street in the vicinity of the tracks of the defendant Burlington, Roy Vermaas did run into the path of a train that was proceeding in an easterly direction, resulting in a collision; and that said collision was the proximate result of the negligent and careless acts of omission and commission of the defendants and each of them, other than the United States Rubber Company, proximately resulting in injuries and damages which are fully set forth in the petition. The negligent

acts of omission and commission of the defendant Burlington and defendant Roy Vermaas are set out in the petition. The petition further alleged that as a proximate result of the negligent acts of the defendants alleged, severe and permanent injuries resulted to the plaintiff's ward. The prayer of the petition was for damages in a substantial amount.

The answer of the Burlington admitted the acts of negligence of the defendant Roy Vermaas alleged by the plaintiff's petition; denied negligence on its part; alleged that the accident was caused by the negligence of the driver of the automobile, and set out the negligent acts of omission and commission of Roy Vermaas as the driver of the automobile involved, and of plaintiff's ward; alleged that the driver of the automobile and the plaintiff's ward were engaged in a joint enterprise; alleged contributory negligence on the part of the plaintiff's ward, setting forth several allegations wherein this defendant claimed that such ward was guilty of contributory negligence; and denied the allegation of the petition as to the injuries sustained by the plaintiff's ward. The prayer was that plaintiff's petition be dismissed.

The answer of the defendants Vermaas admitted that the defendant Burlington was negligent as alleged in the plaintiff's petition; denied negligence on their part; alleged that the accident was proximately and directly caused by the negligence of the defendant Burlington, and set forth the specific acts of negligence of the Burlington; and alleged that at all times the plaintiff's ward rode within the automobile of Roy Vermaas as a guest. The answer prayed for dismissal of the plaintiff's petition.

By amendment to the plaintiff's petition, the plaintiff pleaded that at all times mentioned there was in full force and effect a city ordinance of the city of Lincoln, limiting the speed of trains within the corporate limits to 18 miles an hour.

The plaintiff assigns as error the following: (1) The trial court erred in giving instruction No. 27 which stated that the jury was not at liberty to find the Burlington negligent on account of the speed alone at which the train in question approached the crossing in question; (2) the trial court erred in giving instruction No. 27 which allowed the jury to consider the speed of the train in question only in connection with the negligence otherwise charged in plaintiff's petition; (3) the trial court erred in giving instructions No. 19, No. 28, No. 34, and each of them, which pertain to the duties of a driver and the occupant, or occupants, thus submitting to the jury the issue of contributory negligence of plaintiff's ward, after the court had determined as a matter of law that the plaintiff's ward was not contributorily negligent; (4) the trial court erred in giving instruction No. 25 which directed the jury to consider whether the parties or any of them were guilty of negligence, thus submitting to the jury the issue of the contributory negligence of the plaintiff's ward, after the court had determined as a matter of law that the plaintiff's ward was not contributorily negligent; and (5) the trial court erred in giving instruction No. 9 which allowed the jury to determine whether plaintiff's ward was a guest or passenger of Roy Vermaas at the time of the accident, when the evidence established that the conveyance was in furtherance of an overall plan for an evening's activities which were in the mutual business interests of the parties.

The record shows that Twenty-seventh Street in Lincoln runs north and south. The railroad crossings on North Twenty-seventh Street consist of tracks of the Chicago, Rock Island & Pacific Railroad, hereafter referred to as the Rock Island, which are located 180 feet south of the double tracks of the Burlington main line which run in a northeast and southwest direction, making an angle at the intersection at the southwest corner of the crossing of Twenty-seventh Street of approxi-

mately 55 degrees. The general area is within the city limits of Lincoln. The Chicago and North Western Railroad Company has a single track which crosses the Burlington tracks just to the west of Twenty-seventh Street, and crosses Twenty-seventh Street just north of the Burlington railroad crossing in a southwest and northeast direction. The Burlington crossing has protection devices at Twenty-seventh Street which consist of a signal installed on the east side of Twenty-seventh Street south of the crossing, containing a pair of red flashing lights facing south and mounted approximately 6 feet 3 inches above the level of the pavement, and an identical signal on the west side of Twenty-seventh Street, north of the crossing, facing north. The standard on the south side holding the flashing lights also contains a bell, a reflectorized cross-buck sign located above the flashing lights containing the words "Railroad Crossing," a reflectorized sign stating "3 Tracks," and a reflectorized sign placed below the flashing lights stating "Stop on Red Signal."

Approximately 16 feet south of the Burlington tracks and 13 feet west of the pavement on Twenty-seventh Street there is located a small signal instrument house, and there are no other obstructions on the east or west side of Twenty-seventh Street between the Burlington and Rock Island railroad tracks.

There is a line of trees running in an east-west direction 432.5 feet south of the Burlington crossing on the west side of Twenty-seventh Street, and a line of houses facing Twenty-seventh Street, south of the trees.

The above sufficiently describes the area relating to the place where the accident occurred.

The record discloses the following.

Marvin L. McGee, a salesman in the petroleum division of the United States Rubber Company, which we will hereafter refer to as the U. S. Rubber Company, testified that he knew Carter and helped him in his work with Champlin outlets in Carter's territory; and that

Roy Vermaas and Earl Vermaas were engaged in operating a Champlin service station in Lincoln at the time of the accident. This was a partnership business. Earl Vermaas is a brother of Roy Vermaas, and at the time of the accident, December 14, 1955, was the owner of the Steak House. McGee and Carter drove Carter's Buick automobile to the Vermaas Service Station where they met Roy Vermaas. The purpose of the meeting with Roy Vermaas was to endeavor to have the products of the U. S. Rubber Company distributed by Vermaas on a wholesale basis to new and existing service stations in the Lincoln trade area. McGee further testified that it had been planned that after dinner that evening they were going to work out a program concerning the stocking of merchandise and solicitation of other Champlin outlets; that the program was to be worked out at the Steak House; and that there were no plans to go to any home, office, or any place other than the Steak House following dinner. Vermaas desired to go home first and freshen up. He invited McGee and Carter to his home for refreshments before going to dinner. McGee, Carter, and Tomsik went to the Roy Vermaas house, had refreshments, and left for the Steak House after 20 or 30 minutes. McGee further testified that the purpose of going to the Steak House was to talk over the matter with Earl Vermaas, the brother of Roy Vermaas and partner in the service station business. Earl Vermaas testified that on December 14, 1955, he was in Scottsbluff, Nebraska; and that he left Lincoln the Sunday before the accident and did not return to Lincoln until the morning after the accident. McGee further testified that he never had any conversation with either Roy or Earl Vermaas relative to a planned meeting. Roy Vermaas invited McGee, Carter, and Tomsik to ride in his 1955 Packard sedan, which invitation was accepted. When they got into the car, McGee sat in the back seat immediately behind the driver, Roy Vermaas. To the right of McGee sat Tomsik, and Carter

sat to the right of Roy Vermaas in the front seat. Mc-Gee further testified that it was dark, the weather was cold, there was no snow, the windows in the car were not steamed over or frosted, the heater was on, and the car was comfortable. The conversation of Tomsik, Vermaas, Carter, and McGee, while riding in the car, was not related to business, but with reference to the interior of the car, and was a rather light conversation. McGee further testified that Roy Vermaas did nothing with reference to driving that attracted his attention. McGee testified that before the accident he was facing the front of the car; that there was no obstruction in front of him; that he was paying close attention to what was in front of him; that he was familiar with automatic lights at railroad crossings; that at no time before the accident did he see flashing lights or hear the whistle or bell of a train approaching; that there was nothing to prevent him from hearing a bell or whistle; that he did not see a headlight of a train in front of him; and that he remembered nothing about the actual accident.

On cross-examination McGee testified that he was not aware that they were approaching a railroad crossing just before the accident; that he did not listen for a train whistle or bell nor look for a headlight; that he never saw the train that hit the Vermaas car; and that he did not know if the signal lights at the crossing were within the range of his vision shortly before the accident.

Tomsik testified that he was a district sales manager for the Champlin Oil and Refining Company; that he knew Roy Vermaas through business associations; and that on December 14, 1955, the U. S. Rubber Company was marketing its products in Champlin service stations. He further testified that Roy Vermaas told him they were going out to dinner, then going to his house to write up the order and watch the fight. This witness called his wife in Norfolk and told her that after dinner

he would be at the Roy Vermaas residence, and gave her the telephone number there. He further testified that it was the intention to go in Carter's car, but Carter said he had supplies in the back seat of his car and not all of them could ride in his car. Thereafter Roy Vermaas offered the use of his car and Carter said that was a good idea as he had been wanting to ride in Roy's new car and now was the time to do so. He further testified that he accompanied McGee and Carter in the Roy Vermaas car in an advisory capacity to Roy Vermaas because of his knowledge of certain elements of service station business, however, he had nothing to do with any agreement or contract that might be entered into by Vermaas and the representatives of the U. S. Rubber Company. They started north on Twenty-seventh Street to go to the Steak House for dinner, and the speed of the Vermaas car was from 25 to 30 miles an hour. He remembered approaching the point where the accident happened. He was familiar with the fact that there were railroad crossings on North Twenty-seventh Street and flashing lights located at the railroad crossings. Before they arrived at the crossings, he saw some red lights flashing. This was when they were 100 to 200 yards south of the Rock Island tracks. The only other lights he could see were neon lights about a quarter of a mile north of the Burlington crossing. He further testified that the red lights he saw as they approached the point where the accident happened went out a short time after he sighted them. After these lights went out, he watched straight ahead. The flashing lights on the right side of the street never did come on. He further testified that he did not hear a whistle, nor did he see a beam of light from a headlight of an engine; and that there was nothing to obstruct his view.

On cross-examination Tomsik testified that he could not tell whether he was looking at the Burlington or Rock Island flashing lights; that he thought he saw a

train about the time he saw the flashing red light; and that when the light went out it was about the same time that a train going east passed by the crossing. He did not see the train that hit the Vermaas automobile. He also testified that when Roy Vermaas invited him to dinner, Vermaas told him that they were going out to dinner then to the Vermaas house for a meeting and to write up an order with the U. S. Rubber Company; that while he was present at the Vermaas house and on the way to dinner, he heard nothing said with reference to a tire order or other business; and that the purpose was to go to the Steak House for dinner and return to the Vermaas house where an order would be written up between Vermaas and the representative of the U. S. Rubber Company.

Roy Vermaas testified that he was the active manager of the Vermaas Service Station and handled Champlin products; that Earl Vermaas owned the Steak House; and that he, Roy Vermaas, had no financial interest in the Steak House. He further testified that he knew Carter and purchased tires from him; and that Carter on occasions suggested a change in the relationship between the U. S. Rubber Company and the Vermaas Service Station business, the idea being to set up a U. S. Rubber Company distributor to furnish new service stations with tires, batteries, and accessories. This witness further testified that he saw Carter and McGee on December 14, 1955, when they drove to the service station between 4:30 and 5 p.m., in Carter's Buick automobile. At that time Carter wanted to know if they could get started on an order. Roy Vermaas told Carter it was late, and he would rather have McGee and Carter come to his house after dinner. McGee and Carter then invited Vermaas to dinner. He accepted the invitation. Carter asked Vermaas if he would call his wife and find out if she would like to go to dinner, and then Carter would call his wife and invite her. Vermaas was unable to contact his wife by telephone, and invited Carter and

McGee to his home for refreshments, and they agreed to this. Afterward, when McGee, Carter, and Tomsik were at the Vermaas house, Roy Vermaas mentioned that it was about 10 minutes until 7 o'clock and the reservation had been made at the Steak House for 7 o'clock. Roy Vermaas further testified that when the parties left his house Carter endeavored to remove certain materials used by salesmen from his car, and Vermaas told Carter that was not necessary, that they would take the Vermaas car. He further testified that he drove north on Twenty-seventh Street, and maintained a rate of speed of 30 miles an hour; and that as he approached the railroad crossing the headlights on his car were operating satisfactorily, all of the windows and the windshield were clear, and all other mechanical parts of the car were in good operating condition. When he was about a block from the Burlington railroad crossing, he looked to see if any signals were flashing, and there were none. When he was about half a block from the railroad tracks, he looked to the right and left and did not see a train approaching from either direction. At that time the flashing lights of the railroad crossing signals were within his range of vision, and none of them were flashing. As he proceeded closer to the railroad tracks, he looked to see if the signals were flashing. They were not, so he crossed the Rock Island railroad tracks and approached the first Burlington railroad track. He looked again to see if the signals were flashing on the right side of Twenty-seventh Street as he proceeded north, and they were not. He again looked to his left and did not see any lights of a train, or a train approaching on any of the railroad tracks. He observed the Burlington flashing light signal on the east side of Twenty-seventh Street, and this signal was not flashing, so he continued across the Burlington railroad tracks. He heard no warnings of the approach of a train, and there was no warning from anyone in the automobile. As he started across the Burlington rail-

road tracks his automobile came in contact with a train, and he remembered nothing until the next afternoon. He further testified that he had no plans or intention of discussing business matters with McGee or Carter at the Steak House, and no arrangements had been made to that end by anyone.

The engineer on Burlington train No. 305, involved in the accident, testified that the engine was a small diesel engine used for freight or passenger service. He further testified that he sat on the right side of the engine about 8 feet from the front of it; that from the top of the engine to the ground would be about 15 or 16 feet; and that the controls of the engine were to his left and at his fingertips. He explained the different instruments, the automatic brakes and the brake system as it operates the train, and testified that the train was equipped with a sanding device in connection with the braking system. He further testified that he applied his emergency brake at the time of the accident; that the fireman rode on the left side of the engine and occupied that position at the time of the accident; and that the train consisted of one coach coupled to the engine, and was en route to Omaha as an extra train. He further testified that the train left the passenger station between P and Q Streets on Sixth Street at approximately 6 p.m. Before leaving the depot, he turned on the electrically operated engine bell. This bell would ring continuously until it was shut off, and it was not shut off that night between the time the train left the depot and the time it stopped after the accident. The bell weighed in excess of 30 pounds. The engine was equipped with a Mars headlight which oscillated in a figure-8 pattern, and with a steady beam light below the Mars light. This witness further testified that both lights were turned on before starting the train, and remained on continuously thereafter. When the train arrived at the dwarf signal at the Missouri Pacific crossing it was going at a rate of approximately 15 miles an hour. Thereafter its speed

was increased to 31 to 32 miles an hour between the Seventeenth and Twenty-seventh Street crossings. This witness further testified that he gave the regular crossing signal of two long blasts of the whistle, one short blast, and another long blast, until the train reached the crossing at Twenty-seventh Street. The engineer further testified that as he approached the Twenty-seventh Street crossing he watched the overhead signal on the signal bridge west of Twenty-seventh Street which controls the south track; that he had seen this signal turn green at the Missouri Pacific crossing at Eleventh Street; that he first saw the flashing lights on the south side of the Twenty-seventh Street crossing when he was approximately 2,000 feet from Twenty-seventh Street, and observed they were operating; and that he first saw the Roy Vermaas automobile on Twenty-seventh Street south of the railroad crossing when it appeared past the line of evergreen trees north of the last house located on the west side of Twenty-seventh Street 432.5 feet south of the crossing. The headlights on the Vermaas automobile were on. The train was then approximately 600 feet from the crossing, and the engineer's vision was not obstructed when he looked toward the Vermaas automobile. He further testified that he checked the overhead bridge signal, the motor gauges, and looked down the track to see if it was clear. He did not apply his brakes when he saw the Vermaas automobile the first time, for the reason that he estimated the speed of that automobile to be 20 or 25 miles an hour, which was not fast, and he was unable to tell whether or not the driver of the car was going to stop. He further testified that he next saw the Vermaas automobile an instant before the impact when it was 2 or 3 feet from the engine. At that time he applied his emergency brakes. The train stopped approximately 600 feet east of the crossing. The train was backed up a minute or so later, until the rear part of it was 75 to 100 feet east of the signal bridge located east of

Twenty-seventh Street. This witness further testified that train No. 305 passed train No. 273 going east on the north track about halfway between Seventeenth and Twenty-seventh Streets.

The fireman on train No. 305 testified that the headlight and the Mars light were operating from the time the train left the depot. When train No. 305 was approaching the crossing on Twenty-seventh Street, he could see the red lights flashing on the south side of the crossing from the time the train was 1,000 feet west of Twenty-seventh Street. The last time he looked at the south signal was 100 feet west of the crossing. He further testified that he heard the whistle of the engine sounding when the train was 600 or 700 feet west of Twenty-seventh Street. The last whistle blast lasted until the train reached the railroad crossing. He estimated the speed of train No. 305 at about 30 miles an hour as it approached Twenty-seventh Street. He further testified that he observed the overhead signal on the bridge west of Twenty-seventh Street until it went out of sight, and the signal was clear.

The rear brakeman and flagman on train No. 305 testified that he rode in the coach; and that he got off of the rear of the train after it stopped, and walked back to warn other trains. He gave as his opinion that train No. 305 was traveling from 30 to 35 miles an hour when it crossed Twenty-seventh Street. He testified that the lights in the coach were on; that he heard the engine whistle as the train approached Twenty-seventh Street; and that he saw the flashing lights on Twenty-seventh Street after the accident as he walked back to the Vermaas automobile.

The conductor on train No. 305 testified that he was seated in the rear seat of the coach on the south side filling out forms. He estimated the speed of the train as it approached the Twenty-seventh Street crossing to be 30 to 35 miles an hour. As the train crossed Twenty-seventh Street, he observed the flashing lights operating

on the south side of the crossing. He further testified that he made a record of the train stops as he was required to do, and which he did that night; and that when train No. 305 stopped it was 7:10 p.m. by his watch. This was verified by a delay report made out by the conductor. He further testified that he called the dispatcher from a telephone located near the signal bridge east of Twenty-seventh Street, and informed the dispatcher of the accident.

The other brakeman on train No. 305 was on the north side of the coach. He testified that he observed that the engine's lights were on when the train left the depot. He estimated the speed of the train at approximately 35 miles an hour. He further testified that he observed the light in the side of the flashing signals at the Twenty-seventh Street crossing.

The engineer on train No. 273 which was composed of 27 freight cars and proceeding east from Lincoln on the north track of the Burlington, testified that train No. 273 stopped 200 feet west of the signal bridge west of Twenty-seventh Street due to motor trouble; that the signal on this bridge was green when the train stopped, and turned red shortly afterward; that the steady beam light and the Mars light were operating on train No. 273; that train No. 305 passed train No. 273 just east of Seventeenth Street; that in his opinion train No. 305 was going at a rate of speed of 30 miles an hour when it passed train No. 273; that he estimated the speed of train No. 273 was from 5 to 14 miles an hour; that he observed the headlight and Mars light on train No. 305, and the coach lights, all of which were operating; and that he heard the whistle of train No. 305 as it approached the Twenty-seventh Street crossing.

The conductor on train No. 273 testified that he was sitting in the caboose when this train stopped at the signal bridge west of Twenty-seventh Street at 7:10 p.m. Thereafter he walked to Twenty-seventh Street and observed the crossing signals operating. He ob-

served the headlights on train No. 305 as it came up behind train No. 273 before passing it, and they were operating. Train No. 273 was delayed somewhat due to motor trouble, and was eastbound to Pacific Junction, Iowa.

Thelma Olson testified that she resided one block north and one block west of the railroad tracks here involved; that on the day of the accident she saw the mail train on the Burlington tracks cross Twenty-seventh Street at 2 p.m.; and that the flashing light signals were working. She further testified that she arrived at the place of the accident about 3 minutes after it happened; that she heard the whistle of the train, and noticed a train sitting on the east side of the crossing; and that the flashing signals were still working at that time.

Leora Johns testified that she saw the accident when she was driving her automobile north on Twenty-seventh Street; and that as she was crossing the Rock Island tracks she saw the swinging Mars headlight on the train when it was a block west of Twenty-seventh Street. She did not remember whether she heard a train whistle or saw the flashing signals operating, nor did she remember if she looked to see if the flashing lights were operating.

Dr. Alfred Hausrath, a mechanical engineer, after setting forth his qualifications and the manner, form, and technique used to discern the speed of automobiles, trains, and vehicles in general, determined that train No. 305 was traveling at a rate of speed of 52 miles an hour at the time of the collision.

Another expert, a consulting engineer and college professor who had conducted and participated in a great many tests of brake shoes and the stopping ability of trains, made an analysis from certain facts using his knowledge with reference to the subject matter, and determined that train No. 305 was traveling at a rate of speed of 55.2 miles an hour at the time of the collision.

A consulting engineer with many years experience

doing research in engineering for large companies testified that by taking into consideration certain facts, and by his expert knowledge and analysis, he concluded that train No. 305 was operating at a speed of 52.2 miles an hour at the time of impact.

A Lincoln city police officer, connected with the traffic division and whose duty it was to investigate automobile accidents, testified that he was called to the scene of the accident at the Burlington crossing on North Twenty-seventh Street, on December 14, 1955, arriving there at approximately 7:20 or 7:25 p.m. He observed the Vermaas car 12 or 15 feet south of the south track of the Burlington. From measurements taken from the south Burlington track this automobile was 193 feet east of Twenty-seventh Street. On cross-examination this witness testified that he observed the cross-buck signals, and they were flashing off and on.

The plaintiff contends that excessive speed of a train within the city limits of a city, when in violation of an ordinance, is in itself sufficient evidence of negligence to hold the railroad company liable for injury, if the jury finds that such excessive speed was a contributing cause of the injury.

In this connection, the plaintiff attacks instruction No. 27 given by the trial court to the jury as constituting prejudicial error. Instruction No. 27 reads as follows: "You are instructed that you are not at liberty to find the defendant railroad company negligent on account of the speed alone at which the train in question approached the crossing in question, but you are at liberty to consider the speed at which the train was proceeding at the time of the accident with all the other evidence in the case, in coming to a conclusion as to whether said defendant railroad company is chargeable with the negligence otherwise charged in plaintiff's petition."

The plaintiff's petition charged the Burlington with negligence in the following respects: (a) Failure to maintain proper observation; (b) failure to maintain

proper signal devices; (c) failure to sound any audible warning of the approach of the train to the crossing; (d) failure to have a headlight in operation; (e) operating the engine without proper warning lights; (f) operating the engine at an excessive rate of speed, to wit, in excess of 18 miles an hour in violation of an ordinance limiting speed within the city limits to 18 miles an hour; (g) maintaining defective signal devices at crossing; and (h) although the engineer saw, or should have seen, the approach of said vehicle, he acted in disregard of such knowledge.

At the time of the accident there was in full force and effect an ordinance of the city of Lincoln which provided that no train should be run over any railroad within the corporate limits of the city of Lincoln at a greater speed than 18 miles an hour.

As heretofore mentioned, there is evidence that the speed of the Burlington train in approaching the crossing was in violation of the city ordinance. The trial court, in instruction No. 25, informed the jury that the violation of the city ordinance was not in and of itself negligence, as a matter of law, but the violation thereof was evidence of negligence which the jury should consider together with all the other evidence in the case to determine whether or not the parties, or any of them, were guilty of negligence. While instruction No. 25 will be considered in connection with another assignment of error, insofar as it relates to the violation of the city ordinance, it is a proper instruction.

It is the rule of this court that: "A violation of statutes regulating the use and operation of motor vehicles upon the highways is not negligence per se, but evidence of negligence which may be taken into consideration with all the other facts and circumstances in determining whether or not negligence is established thereby." Landrum v. Roddy, 143 Neb. 934, 12 N. W. 2d 82, 149 A: L. R. 1041. See, also, O'Neill v. Henke, 167 Neb. 631, 94 N. W. 2d 322; Gleason v. Baack, 137 Neb. 272, 289 N. W.

349. The same rule would apply to the operation of trains within the city limits in violation of a city ordinance.

From our research, we find no case in this state holding that the excessive speed of a train, in and of itself, constitutes negligence per se.

Instruction No. 27 given in the instant case is substantially the same as an instruction appearing in the case of Kepler v. Chicago, St. P., M. & O. Ry. Co., 111 Neb. 273, 196 N. W. 161. This court said that the court did not err in giving instruction No. 14, in substance that the jurors were not at liberty to find the defendant negligent in running its train at the rate at which it was running, but were at liberty to consider the speed of the train in connection with other negligence in the manner charged. The court said: "There can be no error in this instruction. If the train was being run at a high rate of speed and the engineer was engaged in getting everything out of his engine that it could accomplish, it is possible that his intentness upon the matter of speed might make him forgetful of his duty to ring the bell or blow the whistle. * * * And it sufficiently appears that the court otherwise in such instruction indicated that the matter of speed was not in itself a ground of negligence."

Instruction No. 27 does not prohibit the jury from considering speed as evidence of negligence if the jury found there was a violation of the city ordinance. There are other instructions relating to this subject matter which we deem unnecessary to set forth. We conclude that instruction No. 27 given by the trial court did not constitute prejudicial error.

The plaintiff contends that the evidence discloses that the purpose of using the automobile of Roy Vermaas was to further the mutual business interests of the parties, and that the trial court erred in failing to instruct the jury that, as a matter of law, Carter was a

passenger and not a guest in the Roy Vermaas automobile at the time of the accident.

Section 39-740, R. R. S. 1943, provides in part: "The owner or operator of a motor vehicle shall not be liable for any damages to any passenger or person riding in such motor vehicle as a guest or by invitation and not for hire, unless such damage is caused by the driver of such motor vehicle being under the influence of intoxicating liquor or because of the gross negligence of the owner or operator in the operation of such motor vehicle. For the purpose of this section, the term 'guest' is hereby defined as being a person who accepts a ride in any motor vehicle without giving compensation therefor, * * *."

It is necessary in this case, in order to arrive at a decision herein, to determine the status of Carter while he was riding in the Roy Vermaas automobile, that is, was Carter a guest or a passenger? The burden of establishing Carter's status as a passenger was on the plaintiff. Lincoln v. Knudsen, 163 Neb. 390, 79 N. W. 2d 716.

In Born v. Estate of Matzner, 159 Neb. 169, 65 N. W. 2d 593, we said: "A guest by the terms of section 39-740, R. R. S. 1943, is a person who accepts a ride in a motor vehicle without compensation therefor." See, also, Eilts v. Bendt, 162 Neb. 538, 76 N. W. 2d 623.

The next question is whether or not there was an issue of fact on this question. We said in Van Auker v. Steckley's Hybrid Seed Corn Co., 143 Neb. 24, 8 N. W. 2d 451, that: "If the evidence is undisputed, or such that minds of men could not reasonably arrive at any other conclusion, the question is one for decision by the court as a matter of law; otherwise, it is a question for the jury to decide as other issuable facts in the case."

"The question of whether a person riding in a motor vehicle is a guest, or engaged in a joint enterprise, or other relationship, is generally one for determination in the individual case. It must be ascertained from facts establishing the identity of the persons advantaged

by the carriage, the relationship between the parties, and the purposes to which the transportation is incident." Van Auker v. Steckley's Hybrid Seed Corn Co., *supra.* See, also, Paxton v. Nichols, 157 Neb. 152, 59 N. W. 2d 184.

"The phrase 'without giving compensation therefor' (Comp. St. Supp. 1939, section 39-1129, now section 39-740, R. R. S. 1943) indicates an intention not to limit compensation to persons specifically paying for transportation in cash or equivalent, or to require that it pass exclusively from the passenger to the driver." Van Auker v. Steckley's Hybrid Seed Corn Co., *supra.* See, also, Born v. Estate of Matzner, *supra.*

"A person riding in a motor vehicle is a guest if his carriage confers only a benefit upon himself and no benefit upon the owner or operator except such as is incidental to hospitality, social relations, companionship, or the like, as a mere gratuity. However, if his carriage contributes such tangible and substantial benefits as to promote the mutual interests of both the passenger and the owner or operator, or is primarily for the attainment of some tangible and substantial objective or business purpose of the owner or operator, he is not a guest." Van Auker v. Steckley's Hybrid Seed Corn Co., *supra.* See, also, Gunn v. Coca-Cola Bottling Co., 154 Neb. 150, 47 N. W. 2d 397; Born v. Estate of Matzner, *supra.*

"A benefit to the owner or operator of a motor vehicle sufficient to remove an occupant riding in it from the provisions of the guest statute must be a tangible and substantial one and a motivating influence for his furnishing the transportation." Born v. Estate of Matzner, *supra.*

There would be no useful purpose in citing and discussing cases from foreign jurisdictions for the reason that we have said that each case must stand on its own facts, and those facts must be gauged by the standards

which we have heretofore determined should be applied thereto.

We have heretofore set out the evidence relating to this issue and shall not repeat it. Under the controlling standards heretofore set out, we think the evidence establishes as a matter of law that Carter was riding in the Roy Vermaas automobile as a guest at the time of the accident. It is true, the trial court submitted the issue as to whether Carter was a guest or passenger in the Roy Vermaas automobile to the jury in instruction No. 9. In the light of our conclusion, discussion of instruction No. 9 becomes unnecessary, and the plaintiff's assignment of error cannot be sustained.

The plaintiff contends that the trial court committed prejudicial error in submitting to the jury issues as to duties of care imposed upon an occupant of an automobile which has been struck by a railroad train, when there was no evidence in the record as to the negligence on the part of such occupant.

The trial court, in instruction No. 10, instructed the jury that there was no sufficient evidence to sustain a finding of negligence on the part of plaintiff's ward, and therefore all allegations and claims of negligence against Carter were withdrawn from the consideration of the jury.

The trial court, in instruction No. 34, instructed the jury: "You are advised that the existence of automatic signals at a crossing does not excuse the driver and an occupant of a motor vehicle from exercising due precaution and looking where he could see, and listening where he could hear, for an approaching train." Instruction No. 34 was requested by the Burlington.

The words "an occupant," insofar as the jury was concerned, would mean Carter as an occupant of the Roy Vermaas automobile at the time of the accident. Instruction No. 34 directed the attention of the jury to the question of a duty imposed upon Carter in looking and listening for an approaching train. The language

in instruction No. 34 stating that the presence of signals does not "excuse" an occupant of the Roy Vermaas automobile from exercising due care and caution and looking where he could see and listening where he could hear an approaching train, submits the issue of possible failure to exercise precaution, or failure to look, or failure to listen, to the jury.

In Anderson v. Nielsen, 162 Neb. 110, 75 N. W. 2d 372, this court said: "It is of course true that if there was no contributory negligence shown on the part of plaintiff it was prejudicial error to submit that issue to the jury. The controlling rule appears in Allen v. Clark, 148 Neb. 627, 28 N. W. 2d 439, as follows: 'Where contributory negligence is pleaded as a defense, but there is no evidence to support such defense, it is prejudicial error to submit such issue to the jury.' See, also, Driekosen v. Black, Sivalls & Bryson, 158 Neb. 531, 64 N. W. 2d 88; Scott v. Service Pipe Line Co., 159 Neb. 36, 65 N. W. 2d 219; Fick v. Herman, 159 Neb. 758, 68 N. W. 2d 622."

Since the evidence does not substantiate any such claim of contributory negligence on the part of Carter, the submission of the issues contained in instruction No. 34 constituted prejudicial error.

In instruction No. 25, which has heretofore been referred to, the trial court instructed the jury: "If you find that any of the parties to this action violated any of the laws of the State of Nebraska which are set forth in these instructions, or any of the ordinances which were received in evidence during the trial and which are referred to in these instructions, you are instructed that the violation thereof is not in and of itself negligence, as a matter of law, * * *." This instruction submitted the contributory negligence of Carter to the jury after the trial court had determined, as a matter of law, that Carter was not contributorily negligent.

It might be well to point out that the mere fact that

the action was brought by the guardian of Carter, declared to be an incompetent, does not mean that he is not a party to this litigation. He is, in fact, the real party in interest as far as the plaintiff's case is concerned, and he was so treated in the court's instructions to the jury.

In instruction No. 28, the trial court instructed the jury: "The failure of the crossing protection flasher signals to operate at a railroad crossing does not relieve the driver or occupant of an automobile about to cross the tracks from the duty to use due care to look and listen for an approaching train."

Instruction No. 25 and instruction No. 28 are subject to the same objections, that is, that by instruction No. 10, the trial court eliminated any question of the alleged negligence on the part of Carter. By the instructions as above set out the trial court placed before the jury the question of whether Carter, as an occupant of the Roy Vermaas automobile, fulfilled certain duties as are set forth in such instructions. We believe the following to be applicable.

In Barney v. Adcock, 162 Neb. 179, 75 N. W. 2d 683, this court said: "Conflicting instructions are erroneous and they are prejudicial unless it is apparent from the record that the jury was not misled thereby because it is impossible to know which of the directions the jury followed. Peterson v. Chicago, M. & St. P. Ry. Co., 101 Neb. 3, 161 N. W. 1043; Bryant v. Modern Woodmen of America, 86 Neb. 372, 125 N. W. 621, 27 L. R. A. N. S. 326, 21 Ann. Cas. 365; Sanderson v. Huffman, 132 Neb. 321, 271 N. W. 870; Hief v. Roberts Dairy Co., 138 Neb. 885, 296 N. W. 331; Harsche v. Czyz, 157 Neb. 699, 61 N. W. 2d 265."

While the plaintiff predicated error on the giving of instruction No. 19 and the Burlington argued that the giving of this instruction was proper, we believe it is unnecessary to discuss the giving of instruction No. 19 for the reason that the instructions heretofore mentioned and discussed constitute prejudicial error.

We conclude that the plaintiff's assignment of error relating to the instructions above discussed should be sustained for the reason that they constitute prejudicial error.

Under the evidence shown in the record, we conclude that it is sufficient to submit to the jury, under proper instructions, the issue of negligence on the part of the Burlington, and the issue of gross negligence on the part of the defendant Roy Vermaas.

While there are other assignments of error presented on this appeal, inasmuch as a new trial must be had, we deem it unnecessary to discuss such other assignments of error.

For the reasons given herein, the judgment of the trial court should be and is hereby reversed and the cause remanded for a new trial.

REVERSED AND REMANDED FOR NEW TRIAL.