MARY THOMPSON, APPELLEE, V. ANDREW G. EDLER, APPEL-
LANT.

292 N. W. 236

FILED MAY 24, 1940. No. 30711.

*Beatty, Maupin, Murphy & Davis,* for appellant.

*Stevens & Stevens, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE,
CARTER, MESSMORE and JOHNSEN, JJ.

JOHNSEN, J.

The question for determination is whether the evidence is
sufficient to support a finding of gross negligence under the
automobile guest statute.

A jury returned a verdict for plaintiff, in the sum of $1,300, for personal injuries received while riding as a guest, with defendant and his wife, in the front seat of defendant's Chevrolet sedan. Defendant has appealed on the ground that the trial court should have sustained his motion for a directed verdict.

The accident occurred about 4 o'clock a. m., on July 5, 1938. Daylight was breaking, but the headlights on defendant's car were still lit. The parties were returning from Indianola, where they had gone to attend a fourth of July dance. While defendant was driving south on a straight, dry, graveled road, he ran his automobile into the right-hand railing of a wooden bridge, which was located about a .quarter of a mile south of the limits of Indianola. They had come over the same road on their way to the dance. The bridge was about 15½ feet wide and was slightly narrower than the road and shoulder, but it was located in a straight line with the traveled portion of the highway. Defendant sheared off the railing, which was three feet high and constructed of 2 by 6 and 2 by 8 timbers, for the full length of the bridge—a distance of 62 feet—tossing pieces of timber 60 to 70 feet beyond the bridge, driving others through the floor board of the car, and finally causing the automobile to drop and overturn in the creek bed at the south end of the bridge. Plaintiff sustained somewhat severe injuries, including a brain concussion, and claimed to have no recollection of anything that happened from the time the automobile had crossed some railroad tracks at the edge of Indianola. She admitted, however, that up to that time there had been no occasion to find fault with defendant's driving.

These facts, it seems to us, were susceptible of such implications and inferences, as to excessive speed, failure to keep a proper lookout, lack of effort or ability to control the car, and apparent disregard of consequences, as might reasonably be found by a jury, in the absence of some other controlling explanation of the accident, to constitute negligence in a very high degree. The trial court, therefore, did

not err in denying defendant's motion for a directed verdict at the close of plaintiff's evidence.

Nor, in our opinion, would the court have been justified in directing a verdict in favor of defendant, at the conclusion of the case, on the basis of the evidence which he submitted.

It appeared that, north of the bridge, the west shoulder of the road had been widened somewhat by the dumping of garbage. Photographs in evidence show, however, that the garbage deposit did not constitute a part of the usual traffic channel, although it was possible for an automobile to proceed upon it. Whether he had become drowsy or for other reason had failed to keep a proper lookout, defendant apparently allowed his car to drift to the edge of the road, and then suddenly became conscious of his peril. He testified as follows: "The first thing I remember, my car, for some reason, was a little bit too close. * * * I noticed I was too close to the weeds; I started to sway the car back a little more toward the center. * * * I saw the car was easing too close to the weeds; I started to ease it back toward the center. * * * What I first remember was that I thought I had the car a little dangerously close. I started to guide that car back more towards the center because it was hugging too close to the row of weeds. Just as I was pulling over, I remember that is when I first saw the bridge straight ahead of me."

From this testimony, the jury were entitled to infer, as we have indicated, that defendant had carelessly allowed his car to drift too close to the west edge of the road, and that he suddenly came to realize the possible danger of his position. They were entitled to infer, also, that he had not been keeping a proper watch ahead, for, while, by virtue of its extreme position in the road, his car was traveling in a direct line with the west railing of the bridge, he stated that he did not see the white painted structure until the car was only 10 or 12 feet away from it. In fact, it was only after he had become concerned about getting the car back toward the center of the highway that he first observed the bridge. His counsel, in extenuation, sought to create the impression

that possibly the weeds along the edge of the road had obscured his vision, but the jury were not bound to accept this attempted justification, in view of his statement that "I don't know that they did, but for some reason I never noticed the bridge until I was practically on it."

According to defendant's testimony, the car had been proceeding about 40 miles an hour. When he discovered the bridge, he stated that, instead of slackening the speed of the vehicle and attempting to swing it over slightly onto the $15\frac{1}{2}$-foot floor of the bridge, he decided, in apparent disregard of consequences, to crash through the railing, and so he immediately pressed the accelerator down to the foot board. He accordingly drove into the railing, with all the speed that he could command, and plowed across the structure in this manner, with the results which have already been set out. He summarized his own impression of what he had done, on the witness-stand, as follows: "It might have been foolish—I know it was now, if I had it to do over."

The situation was, of course, not one where he could escape the consequences of his act of plowing directly into the railing of the bridge at top speed, under the emergency rule, for the jury would be warranted in finding that the peril with which he was confronted had been created by his own previous negligence. It was, then, simply a question whether his conduct which occasioned the peril, and the course of action which he took in dealing with it, when judged in the light of all the circumstances and its possible and actual results, were such, as together, might properly be found by a jury to constitute negligence in a very high degree. The facts and their implications are such that it cannot be held that defendant was free from gross negligence as a matter of law. We need not determine whether the acts of which defendant was guilty, severally, would constitute gross negligence. Together, however, they made such a composite as required them to be submitted to the jury. A series of acts of ordinary negligence combined may, under certain circumstances, operate to produce gross negligence. In this case, though the jury were not bound to

find that defendant's acts amounted to negligence in a very high degree, they were clearly entitled, from the things which he did, the circumstances which surrounded them, and the results which were produced, to pass upon that question, and it is not our privilege to disturb their verdict.

Defendant cites *Johnk v. Scanlon,* 136 Neb. 187, 285 N. W. 488, as being similar in its facts. There, the defendant failed to negotiate a turn onto a bridge, which was constructed at a sharp angle and to the right of the general line of the highway. In this case, the bridge was in a straight line with the traveled portion of the road. An analysis of the *Johnk* case will show that one of the controlling factors in the decision was the fact that the loose gravel was regarded as making the skid marks an unsafe determinant of the speed of the car, and that, as the opinion states, "The record does not establish such speed as would amount to gross negligence under the circumstances." If the other evidence had been regarded as sufficient to establish excessive speed, the circumstances probably would have, supported a finding of gross negligence. We find nothing in that decision that conflicts with this case.

It must be borne in mind, always, that no decision on gross negligence can constitute an absolute precedent in any other case. Each case necessarily differs somewhat in its particular facts and circumstances, and in the composite which results from them. A dissection of the individual facts may, therefore, be misleading, because, in the attempted segregation, part of their real significance may become lost. While it may be regrettable that no perfect yardstick for measuring gross negligence has ever been devised, the numerous decisions, which the guest statutes have produced, seem rather clearly to demonstrate that this is as close as it is possible to come to a judicial solution. If the tapeline of past decisions seems at times to be somewhat inaccurately applied, and the processes of logic to be a bit variable in their result, this may be largely because the observer is looking at the facts in isolation and not in context. Here, both the bench and the profession must be

on guard. Courts cannot hesitate in directing a verdict where the conviction is clear that negligence in a very high degree is not present. But, if there is adequate proof of negligence, a verdict should only be directed where the court can clearly say that it fails to approach the level of negligence in a very high degree under the circumstances. In all other cases, it must be left to the jury to determine whether it amounts to gross negligence or to mere ordinary negligence. In this case, the question was properly left to the jury.

Defendant has assigned, as a further error, the refusal to declare a mistrial, for an incident that occurred on the trial. A review of the facts shows that the ruling of the trial court was so clearly proper that it could serve no useful purpose to lengthen this opinion to discuss it.

AFFIRMED.