NETTIE CARTER, GUARDIAN OF TROY V. CARTER, INCOMPETENT, APPELLANT, v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, A CORPORATION, ET AL., APPELLEES.

121 N. W. 2d 44

Filed April 12, 1963. No. 35181.

John J. Wilson and Healey & Healey, for appellant.

Mason, Knudsen, Dickesen & Berkheimer, Jack Devoe, and Flansburg, Mattson & Sorensen, for appellees.

Heard before CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

MESSMORE, J.

The plaintiff, Nettie Carter, as the duly appointed guardian of Troy V. Carter, an incompetent person, brought this action in the district court for Lancaster County against the Chicago, Burlington & Quincy Railroad Company, a corporation, Roy Vermaas and Earl Vermaas, individually and doing business as Vermaas Service Station, Vermaas Service Station, Inc., a corporation, and United States Rubber Company, a corporation, defendants, to recover damages alleged to have been

suffered by Troy V. Carter, resulting from a collision between an automobile, owned and operated by the defendant Roy Vermaas, and a train owned and operated by the defendant railroad company, occurring at the intersection of North Twenty-seventh Street, Lincoln, Nebraska, and the defendant railroad company tracks, on the evening of December 14, 1955. As a result of the collision Troy V. Carter received grievous and permanent injuries.

The case was tried to a jury which returned a verdict in favor of the defendants, and each of them, and allowed no recovery against any of them.

The United States Rubber Company, a corporation, is in this case on the ground that it was and is obligated, pursuant to the workmen's compensation law of Nebraska, to make certain payments on behalf of Troy V. Carter who, at the time of the accident, was an employee of said defendant United States Rubber Company. This defendant filed an answer because of its claimed subrogation rights under the workmen's compensation law.

The plaintiff, Nettie Carter, guardian of Troy V. Carter, incompetent, filed a motion for new trial against the Chicago, Burlington & Quincy Railroad Company, a corporation, and a motion for new trial against the defendants Roy Vermaas and Earl Vermaas, individually and doing business as Vermaas Service Station, and Vermaas Service Station, Inc., a corporation. The trial court overruled both of the above motions for new trial. The plaintiff appealed to this court.

For convenience Troy V. Carter will be referred to as Carter; the defendant Chicago, Burlington & Quincy Railroad Company, a corporation, as Burlington; the owner and operator of the automobile here involved as Roy Vermaas; the defendants Roy Vermaas and Earl Vermaas, individually and doing business as Vermaas Service Station, and the Vermaas Service Station, Inc., a corporation, as defendants Vermaas, or as Vermaas;

and other witnesses by their last names or by the positions held by them on occasions as may be required, and the first and last names if necessary to be mentioned.

The plaintiff's petition alleged in substance that on the evening of December 14, 1955, while Carter was riding at the request of Roy Vermaas in his Packard sedan and was being driven by Roy Vermaas to the "Steak House" owned by Earl Vermaas so that he could join them for certain contemplated business negotiations, and while proceeding north on North Twenty-seventh Street in the vicinity of the tracks of the Burlington, Roy Vermaas did drive his automobile into the path of a train that was proceeding in an easterly direction, resulting in a collision; and that the collision was the proximate result of the negligent and careless acts of omission and commission of the defendants and each of them, other than the United States Rubber Company, proximately resulting in injuries and damages which are fully set forth in the plaintiff's petition.

By amendment to the plaintiff's petition, the plaintiff pleaded that at all times mentioned there was in full force and effect a city ordinance of the city of Lincoln, limiting the speed of trains within the corporate limits to 18 miles an hour, also a city ordinance providing there shall be a bell of at least 30 pounds' weight attached to every engine, which shall be continuously rung by the engineer or fireman in charge of the engine while passing over any railroad tracks within the corporate limits of the said city; and that the Burlington violated each of said ordinances by running a train at a speed greater than 18 miles an hour, and by failing to continuously ring the bell attached to such engine.

The answer of the Burlington admitted the acts of negligence of the defendant Roy Vermaas alleged by the plaintiff's petition; denied negligence on its part; alleged that the accident was caused by the negligence of the driver of the automobile and set forth the negligent acts of omission and commission of Roy Vermaas as the

driver of the automobile involved in the accident; and prayed that the plaintiff's petition be dismissed.

While the Burlington's answer alleged several acts of omission and commission of negligence on the part of Carter as constituting contributory negligence, it was held in the first opinion on appeal in this case that there was no competent evidence to support such defense. Also in the first appeal this court concluded that there was sufficient evidence to submit to the jury, under proper instructions, the issue of gross negligence on the part of the defendant Roy Vermaas; and that Carter was a guest riding in the Roy Vermaas automobile at the time of the accident. Carter v. Chicago, B. & Q. R. R. Co., 170 Neb. 438, 103 N. W. 2d 152.

It is admitted that the accident in question occurred within the city limits of the city of Lincoln.

It was stipulated by the parties that at the time of or immediately before the accident there were no trains occupying or running upon the Chicago & North Western tracks, or the Chicago, Rock Island & Pacific tracks, or the Omaha, Lincoln, and Beatrice Railway tracks in the vicinity of North Twenty-seventh Street.

It was further stipulated that the locomotive involved in the accident was a SD-7 locomotive equipped with 12 driving wheels of 40-inch diameter, said wheels being of rolled steel, heat treated and rim quenched; also equipped with clasp-type truck brakes operated by 12 brake cylinders, air brakes, and foundation brakes comprised of 14-inch brake shoes manufactured by the American Brake Shoe Company, and an automatic sanding device which operated upon application of the emergency brake system.

It was further stipulated that the passenger coach was Pullman built in 1922 of steel construction, equipped with two 6-wheel trucks, with clasp-type brakes, and of an overall length of 79 feet 2½ inches, and weighed 167,600 pounds.

The record shows that Twenty-seventh Street in Lin-

coln runs north and south. The railroad crossings on North Twenty-seventh Street consist of tracks of the Chicago, Rock Island & Pacific Railroad which are located approximately 180 feet south of the double tracks of the Burlington main line which run in a northeast and southwest direction, making an angle at the intersection at the southwest corner of the crossing of Twenty-seventh Street of approximately 55 degrees. The Chicago & North Western Railroad Company has a single track which crosses the Burlington tracks just to the west of Twenty-seventh Street, and crosses Twenty-seventh Street just north of the Burlington railroad crossing in a southwest and northeast direction. The Burlington crossing has protection devices at Twenty-seventh Street which consist of a signal installed on the east side of Twenty-seventh Street south of the crossing, containing a pair of red flashing lights facing south and mounted approximately 6 feet 3 inches above the level of the pavement, and an identical signal on the west side of Twenty-seventh Street, north of the crossing, facing north. The standard on the south side holding the flashing lights also contains a bell, a reflectorized cross-buck sign located above the flashing lights containing the words "Railroad Crossing," a reflectorized sign stating "3 Tracks," and a reflectorized sign placed below the flashing lights stating "Stop on Red Signal."

South of the Burlington tracks and west of the pavement on Twenty-seventh Street there is located a small signal instrument house, and there are no other obstructions on the east or west side of Twenty-seventh Street between the Burlington and Rock Island railroad tracks.

There is a line of trees running in an east-west direction 432.5 feet south of the Burlington crossing on the west side of Twenty-seventh Street, and a line of houses facing Twenty-seventh Street, south of the trees. There is a whistle post south and west of the Twenty-seventh Street Burlington tracks at a distance of 1,363 feet.

The area in the vicinity of the Burlington crossing and Twenty-seventh Street is substantially level.

Marvin L. McGee testified that he was employed by the United States Rubber Company on December 14, 1955, as a salesman promoting business with various petroleum companies. He was acquainted with Carter, knew him as a salesman for the company, and worked with him. This witness was contacting Champlin oil dealers relative to the sale of United States Rubber Company products, and Carter was working with him in the territory under the supervision of this witness. McGee came to Lincoln on December 13, 1955, to meet Carter and assist him in his work with the Champlin outlets in the territory. Roy Vermaas was one of the outlets. In the evening of December 14, 1955, Carter and McGee drove to the Vermaas place of business where they met Roy Vermaas. There had been previous arrangements made for this meeting. The purpose of the meeting was to have United States Rubber Company products distributed to new and then existing service stations by Vermaas on a wholesale basis to such distributors. Roy Vermaas invited them to come to his house where they arrived sometime past 6 p.m. While there they had one highball, and remained 20 or 30 minutes, then made preparations to go to the Steak House, using Roy Vermaas' new 4-door Packard sedan. Roy Vermaas was driving, this witness was in the back seat behind the driver, Tomsik was to the right of this witness, and Carter was seated in the front seat to the right of the driver. It was cold, there was no snow, the windows of the automobile were not steamed over or frosted, the heater was working, and it was a dark evening. The radio was not turned on. The conversation between the men was rather light. This witness further testified that he was facing the front of the car, and there were no obstructions in front of him. He thought he was making a fairly continuous observation straight ahead and paying fairly close attention. Before the collision,

he did not see any flashing lights come on in front of the automobile. The automobile was running quietly, and there was no loud noise in it as it approached the point where the accident happened. He did not hear the whistle of a train, nor did he hear a bell ringing. There was nothing to prevent him from hearing a bell or whistle. He did not see a headlight of a train in front of him. Roy Vermaas did nothing with reference to driving which attracted his attention. He remembered nothing about the accident.

On cross-examination this witness testified that he was not familiar with that part of the city; and that the plan was that they would eat their dinner, settle their business, and then depart from each other.

Joe E. Tomsik testified that he was a district sales manager of Champlin Oil and Refining Company; that he managed all sales in his district which included southeastern Nebraska; that he was in Lincoln on December 14, 1955, and knew Roy and Earl Vermaas; and that he saw Roy Vermaas at the service station at approximately 5 p.m., or shortly thereafter on that day. Roy Vermaas told him the United States Rubber Company representatives were going out to dinner with him, and he invited this witness to go with them, which invitation was accepted. Roy Vermaas said they were going to dinner, then go back to his home, make the deal, and watch the fight. This witness further testified that he arrived at the Vermaas home at 6 p.m., or a little thereafter; and that they started for the Steak House on the Cornhusker Highway, and proceeded north on Twenty-seventh Street. The headlights of the automobile were on, and the speed of the automobile was between 25 and 30 miles an hour. He further testified that he was familiar with the railroad tracks on North Twenty-seventh Street; that there were flasher lights located at that railroad crossing; that when they were 100 to 200 yards south of the Rock Island crossing he saw some red lights flashing; that these red lights went out just a short while after he saw

them; and that after they went out he watched straight ahead and the flashing lights on the right side never did come on. He further testified that he did not hear a whistle, nor did he see a beam of light from a headlight of an engine, and there was nothing to obstruct his view.

On cross-examination this witness testified that Roy Vermaas told him the purpose of the meeting was to go to the Steak House for dinner, then return to the Vermaas house and write up an order; and that as they were driving north on Twenty-seventh Street there was nothing unusual about the way Roy Vermaas was driving.

Roy Vermaas testified that he was engaged in the business of the Vermaas Service Station, handling Champlin products; that the accident happened at Twenty-seventh Street and the Burlington railroad tracks; that he was driving north en route to the Steak House; that his automobile weighed 4,470 pounds; that the train came from the west traveling northeasterly; that his automobile was operating properly; that he was familiar with the railroad crossing on North Twenty-seventh Street and had traveled North Twenty-seventh Street numerous times; that he was familiar with the signal lights located at the crossing prior to the accident, and prior thereto had seen them operating; that he left his home about 10 minutes until 7 o'clock; that there was nothing to obstruct his vision as he looked ahead or to his right; that he never heard a train whistle; that the windows of the car were rolled up; that he was aware of the fact that he was approaching this crossing; that he did not hear a bell; and that there was no traffic ahead of him. He looked to the right side where he knew the signals were located as he approached the crossing. He saw no flasher lights operating on the Rock Island crossing. After he crossed the Rock Island tracks, he looked to the right side of the road toward the Burlington tracks, saw no flashing signals operating before the accident, and looked to the left as he approached the Burlington

crossing after he had passed the Rock Island crossing. He did not see a train. The speed of the automobile was approximately 30 miles an hour. He did not apply his brakes. The streets were dry. He further testified that no one complained about his driving; and that the headlights on his automobile were on low beam.

On cross-examination this witness testified that he had no financial interest in the Steak House; that he had been there many times; that the Steak House was owned and operated by Earl Vermaas who was in Scottsbluff at the time of the accident; and that between the line of trees and the Burlington tracks there was pretty much open field with no structures other than right at the Burlington crossing.

The engineer on Burlington train No. 305 testified that the engine was a small diesel engine used for freight or passenger service; that he sat on the right side of the engine; that there were just two units to train No. 305, and there were no passengers on the train; and that the total height of the engine was 14 feet 11 inches. This witness further testified that when they leave the depot, tests are run on the brake system, and these tests were conducted on December 14, 1955; and that the braking system was all right, working as it should. On cross-examination he testified that the brakes were in perfect working order on the engine and on the coach at the time of the accident. He explained the different instruments, the automatic brakes and the braking system as it operates the train, and testified as to the sanding device in connection with the braking system. He further testified that he applied the emergency brake at the time of the accident; and that before leaving the depot, he turned on the air power operated bell which then rang continuously until it was shut off, and it was not shut off that night between the time the train left the depot and the time it stopped after the accident. The engine was equipped with a Mars headlight which oscillated in a figure-8 pattern, and with a steady beam light.

This witness further testified that both lights were turned on before starting the train and remained on continuously thereafter. The speed of the train was increased to 31 or 32 miles an hour between the Seventeenth and Twenty-seventh Street crossings. This witness further testified that he gave the regular crossing signal of two long blasts of the whistle, one short blast, and another long blast, until the train reached the crossing at Twenty-seventh Street. He further testified that as he approached the Twenty-seventh Street crossing he watched the overhead signal on the signal bridge west of Twenty-seventh Street which controls the south track. He had seen this signal turn green at the Missouri Pacific crossing at Eleventh Street, and it did not turn red as he approached it. He further testified that he first saw the Roy Vermaas automobile on Twenty-seventh Street south of the railroad crossing when it appeared past the line of evergreen trees north of the last house located on the west side of Twenty-seventh Street; that the headlights of the automobile were on; and that the train was approximately 600 feet from the crossing, and his vision was not obstructed when he looked toward the Vermaas automobile. He further testified that he checked the overhead train signal and looked down the track to see if it was clear, and it was. He estimated the speed of the Vermaas automobile to be 20 to 25 miles an hour. He further testified that he next saw the automobile an instant before the impact. At that time he applied his emergency brakes and the train stopped approximately 600 feet east of the crossing.

A brakeman on train No. 305 testified that he assists the conductor, and assists in the brake tests. He was sitting on the left side of the coach toward the rear just before the emergency brake went on. He was looking northward at the lights on the Cornhusker Highway. He estimated the speed of the train at 35 miles an hour. He observed the signal lights of the railroad

crossing on the north side of the tracks at Twenty-seventh Street, the flasher lights that protect the crossing for automobiles. He saw the white lens in the side of the signal lights. He got off of the train when it stopped and walked toward the wrecked automobile. The lights were on in the coach as the train approached Twenty-seventh Street. The headlight of the engine was on, and he saw the lights shining on the tracks.

The conductor on the train testified that he was in the rear seat of the coach on the south side filling out reports. As the train approached Twenty-seventh Street, the lights were on in the coach. The first thing he noticed was the application of the air emergency brakes. He estimated the speed of the train at 30 miles an hour. At the application of the air, he looked out the window, and across the North Western crossing he noticed the little white signal light which was on the flasher light protecting the crossing on the south side.

The fireman on train No. 305 testified that he sat opposite the engineer, and recalled the accident of December 14, 1955, which occurred about 7 or 7:10 p.m. He further testified that he observed the left side of the right-of-way and would call the block signals to the engineer and what color they were; that he was familiar with the overhead signal located approximately 365 feet west of Twenty-seventh Street, that the headlights of the engine were on continuously during the trip; that the bell on the engine was turned on when the train left the depot and was never turned off; that as the train approached Twenty-seventh Street he could see the south flasher lights working; that these lights control the crossing for motorists on Twenty-seventh Street; that he saw the wide face of it, that is, the red part of the flasher; that as the train proceeded from the depot, he observed the overhead block signal for the south track and it was green and remained green as the train approached the Twenty-seventh Street crossing; and that the whistle on the train was sounded as it approached

the crossing. He further testified that he saw the flasher lights 1,000 feet from the crossing.

Mrs. Thelma Olson testified that she lived a block north and a block west of the Twenty-seventh Street Burlington crossing. She recalled the accident which occurred about 7 p.m. She went to the crossing following the accident and observed the flashing lights operating. She and her husband observe the crossing because they have mail trucks for mail routes, one to Union and one to Beatrice. She further testified that a passenger train coming from the east passes that crossing generally at 2 p.m., and in effect controls the selection of the trucks sent on the routes; that she saw the passenger train that day; and that the flashers were operating when the train went through the crossing at Twenty-seventh Street.

Mrs. Leora Johns testified that she witnessed the accident at about 7 p.m.; that she was driving north on Twenty-seventh Street; that she believed she was on the Rock Island tracks immediately south of the Burlington tracks at the time of the accident; that before she arrived at the Rock Island tracks she looked to the west down the Burlington tracks; and that she could see a headlight of a train, which was a swinging light. She would guess that this was approximately 1 block away. She did not hear a whistle. On cross-examination she testified that she saw the automobile go off the front of the train; and that it flew through the air. On redirect examination she was unable to estimate how far the automobile was thrown into the air.

A signal maintainer for the Burlington testified that the area of North Twenty-seventh Street was within his jurisdiction; that he made an inspection of the signal flasher system once each week; that he made an inspection on December 6, 1955, and on December 14, 1955, the latter being made at 7:45 p.m.; that he also made an inspection on December 20, 1955; that the signals were in operating order on December 14, 1955, and on the

other dates the inspections were made; that he found no broken wires in the lamps and no burned out bulbs; and that the distance at which a train approaching Twenty-seventh Street from the west going east on the south track would activate the flasher signal at Twenty-seventh Street would be 3,069 feet.

Dr. Alfred Hausrath testified that his speciality was determining the way materials such as steel, rubber, plastic, aluminum, and concrete, so-called engineering materials, behave under certain types of loads. This is concerned with dynamics, a study of moving bodies and what happens during the time they come together. He further testified that if he knows the speeds and directions of two objects before they hit, he can determine the speeds and directions after they hit; that he has had experience in testing materials, particularly under impact of rapid loads; and that he used the "conservation of momentum" principle. He examined several exhibits which showed dents on the impact side of the automobile and what parts of the train struck the automobile to cause the dents. He determined that there was no way in which the automobile could have reached its final resting place except by flying through the air. He further testified that from the examination of the facts at his command, he was able to determine the speed of the automobile from the time of the collision until it came to rest, and determined that the automobile had a speed, due to the impact, of about 60 miles an hour from the time it left the point of impact until it came to rest. He determined the speed of the automobile before the collision and after the collision and where it landed, and considered that there were no scratches on the left side of the automobile as the result of the impact. He further considered the weight of the Roy Vermaas automobile, and assumed that with the passengers its total weight was 4,970 pounds. He determined that the train, the engine and passenger car and crew, had a total weight of 497,600 pounds; and that the speed of the

train prior to the impact would be 52 miles an hour.

A consulting engineer who participated in many tests on brake shoes and the stopping abilities of trains testified that in reaching his determination as to the speed of the train, he assumed the characteristics of the train and coach, the testimony of the employees of the Burlington, that the sanding device was automatically applied in the locomotive, and that the brake control lever was thrown into emergency position at the point of impact. He took into consideration the grade, the weight of the automobile, the knowledge he had of brake shoes manufactured by the American Brake Shoe Company, and that the locomotive gets air at least 2 seconds after the emergency brake is thrown. Assuming all the facts, he used a formula which enabled him to determine the speed of the train at 55.2 miles an hour.

Another consulting engineer made a computation as to the speed of the train. He assumed the condition of the terrain on North Twenty-seventh Street, the speed of the automobile, the photographs of the intersection, and by making an inspection of the Burlington tracks where the accident occurred. Using all the facts he was able to obtain, he was able to compute the speed of the train at 52.2 miles an hour.

An associate professor in engineering mechanics at the University of Nebraska with special training in dynamics of automobile collisions testified that from an examination of Dr. Hausrath's testimony, the photographs of the Vermaas automobile, and by examining the scene where the accident occurred, he was of the opinion that when the automobile and the train collided, the automobile became temporarily attached to the front of the train and was carried by it until the train slowed down and the automobile was released and rolled down the embankment. This witness gave an opinion that if the automobile bounced as Dr. Hausrath believed it did, it would have to have been at a height of 18 or 20 feet to move a distance of 180 feet in the air. He did not

believe that the automobile could have bounced that high for the reason that it would require considerable upward thrust to be imposed by the locomotive, and this would require a sloping plane on the front end of it rather than a flat surface such as the locomotive had. He did not think it possible to determine the speed of the train before the accident from an examination of the material that Dr. Hausrath had, nor was it possible to determine very precisely the northerly component speed of the train before the accident because the difference in northerly component speed of the two vehicles would be absorbed when they came together and remained fastened. This would also prevent the formation of particularly large scratches. In his experience and studies he had never heard of one vehicle flying as high as 18 or 20 feet when two vehicles came together, and he testified that it was beyond possibility in this type of collision.

A motorcycle sergeant employed by the Lincoln police department testified that on December 14, 1955, he received a call at 7:14 p. m., and proceeded to the scene of the accident, arriving at approximately 7:20 p. m. He observed a train east of Twenty-seventh Street on the south Burlington track, and an automobile east of Twenty-seventh Street south of the tracks facing north. He made a measurement that disclosed the automobile was approximately 193 feet east of Twenty-seventh Street. The automobile was at a lower level than the height of the tracks. The terrain south of the tracks at that point was more or less like a gully, with probably a dropoff of 10 feet below the track. On cross-examination this witness testified that he observed the flashing signals at the crossing, they were operating when he arrived and continued to do so, and that the bell on the crossing was ringing and it continued to ring. The several lights on the train coach were on.

The plaintiff contends that the trial court committed prejudicial error in giving instruction No. 19 to the jury. The plaintiff bases this contention on the ground that

the evidence disclosed that the train was traveling at an excessive rate of speed in violation of a city ordinance.

The plaintiff makes no claim that excessive speed of a train in violation of a city ordinance is negligence per se, but contends that it is evidence of negligence when proved as an independent ground of negligence.

We set forth the following instructions given by the trial court relative to the above-stated proposition, and will take up the plaintiff's contentions relating to instruction No. 19 as to whether or not it was prejudicially erroneous. In addition we will discuss the matter of the speed of the train later in the opinion.

Plaintiff's requested instruction No. 1 is as follows: "You are instructed that the violation of the Lincoln City ordinance regulating speed does not in and of itself constitute negligence, but the violation of said ordinance is evidence of negligence, and may be considered along with all the evidence and circumstances in determining whether the defendant railroad was negligent. If you find that the train involved in the accident was operated at a speed in excess of the limit prescribed by the ordinance and that such speed, when considered with all the other evidence and circumstances, constitutes negligence which was a proximate cause of the accident, you must find for the plaintiff and against the defendant railroad."

In instruction No. 9, the jury was instructed in part: "In considering whether any of the defendants were negligent in any respect claimed in this action, you should consider whether they exercised ordinary care in the fulfillment of their duties by compliance with the Statutes of the State of Nebraska, the Ordinances of the City of Lincoln, and the other rules of conduct required of them, as set forth in these instructions. If you find from the evidence that any of the defendants violated any of such statutes, ordinances or other rules of conduct, you are instructed that violation thereof, if such you find, does not in and of itself establish negligence

as a matter of law, but is evidence of negligence, which may be taken into consideration with all other facts and circumstances in determining whether or not the defendants or any of them were guilty of negligence."

Instruction No. 19 is as follows: "It was the duty of the defendant railroad and its employees to comply with rules of conduct providing as follows: . It is the duty of railroad employees in charge of trains to exercise ordinary care to avoid injury to persons in motor vehicles at street crossings, to maintain a reasonable lookout for approaching vehicles, to operate at a reasonable speed under the circumstances, and to give timely warning of the approach of trains. It is the duty of railroad employees in charge of trains to take such amount of precaution as prudent persons would ordinarily exercise under like circumstances, considering the location of the crossing within the city, the intensity of its use by motor vehicles and trains, the relative angles at which each approach the crossing, the visibility available to their operators, and the warning signals and safeguards provided by the railroad. However, in this case, you are not at liberty to find the defendant railroad negligent on account of speed alone, in approaching the crossing, but you are at liberty to consider the speed at which the train was proceeding at the time of the accident, together with all the other facts and circumstances established by the evidence with respect to other acts of negligence claimed by the plaintiff and the defendants Vermaas, in determining whether or not the railroad was negligent."

The plaintiff claims that instruction No. 19 is prejudicial because it states that it is the duty of the railroad employees "to operate at a reasonable speed under the circumstances," but that the instruction left out the language "but not to exceed 18 miles per hour."

In instruction No. 18, the court instructed the jury in part as follows: "It was the duty of the defendant railroad and its employees to comply with Ordinances of the

City of Lincoln, Nebraska, providing as follows: No train, engine or car, shall be run over any railroad in the corporate limits at a greater rate of speed than 18 miles an hour."

This instruction shows that it was the duty of the railroad and its employees to comply with the city ordinance limiting the speed to 18 miles an hour, and that the violation of the ordinance was evidence of negligence to be taken into consideration with all the other facts and circumstances in determining whether or not the defendant railroad was guilty of negligence.

The above instructions should be construed and considered together in determining whether or not there was prejudicial error as contended for by the plaintiff.

The plaintiff contends that instruction No. 19 is erroneous wherein it sets forth the precautions which railroad employees should take; that the instruction asserts that they should take such amount of precaution as a prudent person would ordinarily exercise under like circumstances, considering, among other things, the warning signals and safeguards provided by the railroad; and that in this case the evidence relating to the alleged warning signals and safeguards provided by the railroad was in conflict, and the instruction omitted the words "if any you find," thereby leaving the conclusion as an established fact that the railroad had provided proper warning signals and safeguards which the employees were entitled to take into consideration in determining the speed at which they should travel.

The instruction states that the railroad employees may consider the warning signals and safeguards provided by the railroad. It does not say that warning signals are provided by the railroad, or whether any, in fact, were provided by the railroad.

The plaintiff alleged that the Burlington failed to maintain proper signal devices to warn motorists of the approach of a train, and that the Burlington maintained defective signal devices at the crossing. Neither of the

above alleged specific acts of negligence so pleaded appear in instructions given by the trial court as being submitted to the jury, and are not assigned as error or argued on this appeal. This constitutes the law of the case. See Buhrman v. Smollen, 164 Neb. 655, 83 N. W. 2d 386.

The plaintiff predicates error in that the trial court failed and refused to give plaintiff's requested instruction No. 2 properly stating the duties of operators of a train with respect to lookout and observation.

The first part of instruction No. 19 covers the same matter as appears in the plaintiff's requested instruction.

We fail to find that the plaintiff has seen fit to argue why it was error for the trial court not to give her requested instruction No. 2, or to cite any authorities in support of her position. Failure to point out the error of an instruction in the argument has been held by this court to be sufficient reason for not considering the assignment of error under Rule 8a 2 (4), Revised Rules of the Supreme Court. See Buhrman v. Smollen, *supra*.

In any event, in the first part of instruction No. 19 the same matter is covered as appears in plaintiff's requested instruction No. 2. Furthermore, instruction No. 9 should be construed in conjunction with instruction No. 19, and also instruction No. 15, as follows: "The obligations, rights and duties of railroads and motorists at railroad street crossings are mutual and reciprocal. Neither has the exclusive right of passage. The railroad has a right to use its tracks, and the public have a right to use public streets. Each is required to exercise ordinary care for the safety of the other and all persons, commensurate with the danger involved.

"Motorists are required to yield the right of way to approaching trains, the privilege of the immediate use of the crossing.

"However, the right of way is not an absolute right which may be exercised under all conditions. If the

situation is such as to indicate to a reasonably prudent person that to proceed would probably result in collision, then it becomes the duty of those in charge of the train to exercise ordinary care to avoid an accident, even to the extent of yielding such right of way, and, a failure to do so under such conditions, if such you find, would be evidence of negligence on the part of the railroad, to be considered together with all other evidence and circumstances, in determining whether or not the railroad was negligent."

When such instructions are construed and considered together they comprehensively cover the duties and obligations of a railroad and its employees with respect to keeping a proper lookout for vehicles at railroad crossings.

As heretofore stated, the plaintiff contends that instruction No. 19 is erroneous because it tells the jury that it may not impose a finding of negligence on the part of the railroad on the ground of excessive and illegal speed which is shown by overwhelming evidence in the record; that the excessive speed is evidence of negligence, and is an independent ground of negligence on the basis of which the jury should properly be allowed to make a finding of negligence; that if the jury believed that the established excessive speed was a proximately contributing cause of the occurrence, the judgment should be for the plaintiff; and that the consideration of speed should not be limited to consideration with respect to other claimed acts of negligence.

Instruction No. 19 states only that speed should be considered with other facts, which is in accord with the plaintiff's requested instruction No. 1 heretofore set out.

The words "speed alone" have generally been used when the speed of the train is to be isolated or unconnected from all other evidence as to the circumstances and surroundings of the accident.

We conclude that instruction No. 19 in the instant case, considered together with the other instructions

relating to the point here involved, does not constitute prejudicial error as contended for by the plaintiff.

The plaintiff contends that it is the duty of the trial court to submit to and properly instruct the jury upon all the material issues presented by the pleadings and the evidence, and that a litigant is entitled to have the jury instructed as to his theory of. the case as shown by the pleadings and the evidence, and a failure to do so is prejudicial error. See Harsche v. Czyz, 157 Neb. 699, 61 N. W. 2d 265.

The plaintiff states that in the instant case the trial court committed prejudicial error affecting the plain- tiff as against the defendants Vermaas ·by failing to submit to the jury allegations of negligence made and presented in the plaintiff's pleadings and supported by the evidence, that is, that Roy Vermaas drove at an ex- cessive rate of speed for the then existing conditions; and that in the previous case this court held that the evidence was sufficient to submit to the jury the issue of the gross negligence on the part of Roy Vermaas.

The trial court instructed the jury in instruction No. 13 as follows: "A Nebraska law known as the 'Guest Statute', provides that the owner or operator of a motor vehicle shall not be liable for damages sustained by a passenger riding therein by invitation and not for hire as a 'guest', unless such damages are caused by 'gross negligence' of the owner or operator of such vehicle.

"The Court instructs you that Troy V. Carter was such a guest within the meaning of the statute, and before plaintiff may recover against any of the defend- ants Vermaas, the burden of proof is upon her to prove her allegations that Roy Vermaas was guilty of neg- ligence amounting to gross negligence; and unless you so find, you will allow no recovery against any of them even though you find that they were guilty of ordinary or slight negligence, if any of such you find."

In instruction No. 21, the trial court instructed the jury as follows: "It was the duty of the defendant Roy

Vermaas, to comply with rules of conduct as follows:

"Every driver of a motor vehicle shall always exercise ordinary care under all circumstances.

"When a motorist on a public street approaches a railroad crossing, it is his duty to keep his vehicle under such reasonable control that he can stop in time to avoid collision with an approaching train, although he is not required to keep it under such complete control that he can avoid an accident under all circumstances.

"It is the duty of a motorist when approaching a railroad crossing where there is restricted vision, and where he is familiar with the crossing, to carefully look for approaching trains in order to determine whether he could safely cross the tracks, to look in both directions and to listen, at a time and place where it will be effective, to see any approaching trains that are clearly visible, and to stop and yield the right of way to such trains unless they are at such distance that it would appear to a prudent person that he could safely cross without the danger of accident; and failure to observe this rule without reasonable excuse, if such you find, is negligence as a matter of law.

"It is the duty of a motorist to exercise ordinary care in the avoidance of accidents, and not to test the obvious danger by driving on the railroad tracks into the path of an oncoming train; * * *."

A guest by the terms of section 39-740, R. R. S. 1943, is a person who accepts a ride in a motor vehicle without giving compensation therefor.

The trial court defined gross negligence as great or excessive negligence, negligence of a very high degree.

In Komma v. Kreifels, 144 Neb. 745, 14 N. W. 2d 591, this court said that what amounts to gross negligence in any given case must depend upon the facts and circumstances. What would amount to gross negligence under certain circumstances might, under different circumstances, be even slight negligence. Ordinarily, the

question of negligence, whether slight or gross, is one of fact. If the evidence respecting it is in conflict and is such that ordinary minds might draw different conclusions therefrom, then a question of fact is presented for the jury to determine. See, also, Thompson v. Edler, 138 Neb. 179, 292 N. W. 236; Bishop v. Schofield, 156 Neb. 830, 58 N. W. 2d 207.

In the latter-cited case this court said: " 'As in so many other instances of negligence law, the question whether an operator of an automobile involved in an accident at a railroad crossing was guilty of gross negligence, recklessness, etc., within the meaning of a guest statute, depends upon the facts involved in each case. Accordingly, it is impossible to state any general rule on the question, other than to point out that the general principles laid down by the courts under the guest statutes * * * apply with equal force, of course, in cases involving railroad crossing accidents.' Annotation, 143 A. L. R. 1144."

Under the evidence adduced, and in the light of the instructions given by the trial court on this proposition, we conclude that the trial court did not commit prejudicial error as contended for by the plaintiff.

The plaintiff contends that the engineer saw the automobile in which the plaintiff's ward was riding when the train was approximately 600 feet from the point where the collision occurred; that the engineer did not see the automobile in which the plaintiff's ward was riding at any time between the time he first observed it and the moment of the accident, thus the train traveled approximately 600 feet at a time when it was approaching a crossing known to be a busy crossing, and the engineer did not look for automobiles during this time nor continue to give attention to the Roy Vermaas automobile even though he knew it was approaching the crossing; that the trial court entirely omitted the pertinent allegation made by the plaintiff that the defendant railroad, through its engineer, failed to maintain a proper obser-

vation; that the trial court's instruction No. 2, which involved the plaintiff's claims of negligence against the defendant railroad, entirely omitted this or any similar allegation; and that consequently the trial court eliminated from the consideration of the jury the allegation of improper observation which was pleaded and supported by the evidence.

Instruction No. 19 covered the observation that must be made by the engineer sufficiently on this proposition. The following are applicable.

"Where the charge to a jury in a particular respect contains a correct general statement of the law error cannot be predicated on a failure to give a more specific instruction in the absence of a request therefor." Thurow v. Schaeffer, 151 Neb. 651, 38 N. W. 2d 732, and cases cited therein.

"Instructions must be considered and construed together, and if they are not sufficiently specific in some respects, it is the duty of counsel to offer requests for instructions that will supply the omission, and, unless this is done, the judgment will not ordinarily be reversed for such defects." Plumb v. Burnham, 151 Neb. 129, 36 N. W. 2d 612.

In Shiers v. Cowgill, 157 Neb. 265, 59 N. W. 2d 407, this court said: "Instructions given to a jury must be construed together and if, when considered as a whole, they properly state the law it is sufficient." See, also, Clausen v. Johnson, 124 Neb. 280, 246 N. W. 458; Suhr v. Lindell, 133 Neb. 856, 277 N. W. 381.

In instruction No. 5, the trial court defined negligence as follows: " 'Negligence' is the doing of something which an ordinarily prudent person would not have done under the same or similar circumstances, or the failure to do something which an ordinarily prudent person would have done under the same or similar circumstances. It is the failure to exercise 'ordinary care', which is such amount of caution as a prudent and reason-

able person would exercise under the existing circumstances."

A definition of negligence similar to that given in the instant case was held to be broad enough to cover generally excessive speed, inability to stop within the range of vision, and no proper lookout, and also any other phase of negligence which might find support in the evidence. See Thurow v. Schaeffer, *supra*.

The instructions given by the trial court on the duty of lookout fully and fairly stated the law to the jury under the pleadings and the evidence.

We conclude that the trial court did not commit prejudicial error as contended for by the plaintiff.

Other matters raised need not be discussed.

For the reasons given in this opinion, the judgment of the trial court is affirmed.

AFFIRMED.